# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

JAMIR DAVIS, et al.,

        Plaintiffs,

              v.

WALSH KOKOSING JOINT
VENTURE, et al.,

        Defendants.

Case No. 1:25-cv-393

JUDGE DOUGLAS R. COLE
Magistrate Judge Litkovitz

## OPINION AND ORDER

This case involves an alleged conspiracy of racial discrimination in the construction of the Brent Spence Bridge Project. Plaintiff Jamir Davis alleges that the prime contractor, Walsh Kokosing Joint Venture II; its sub-contractor, WEB Ventures; and Ohio's Department of Transportation coordinated to exclude Black-owned businesses, specifically Davis and his firm, from participating in the project. For the reasons discussed below, the Court **GRANTS** the Defendants' Motions to Dismiss (Docs. 20, 21, 23). Thus, the Court **DISMISSES WITH PREJUDICE** Counts 1 through 5 against Williams, Counts 5 and 12 against Green in her official capacity, and Counts 9 and 12 against ODOT. The Court, however, **DISMISSES WITHOUT PREJUDICE** Counts 5, 6, 7, 8, 10, and 12 because Davis potentially could cure those deficiencies. Based on that, the Court **GRANTS** Davis 30 days to file a motion for leave to amend, attaching the proposed amended complaint.

## BACKGROUND[1]

### A.    The Parties.

This case centers around the Brent Spence Bridge Project (the Bridge Project), a federally funded project designed to "transform an eight-mile portion of the I-71/75 interstate corridor between Kentucky and Ohio." (Compl., Doc. 1-25, #341).[2] Overall, the Bridge Project is estimated to cost $3.6 billion, of which the federal government will contribute $1.635 billion. (*Id.*). Defendant Ohio Department of Transportation (ODOT) oversees the Bridge Project for the State of Ohio, in collaboration with Kentucky. (*Id.*). Because the Bridge Project receives federal assistance, ODOT, as well as any contractors, must comply with certain regulations regarding the utilization of Disadvantaged Business Enterprises (DBEs). (*Id.* at #354–55 (citing 49 C.F.R. 26 et seq.)). Here, when ODOT solicited proposals for the Bridge Project in early 2023, it "required that the successful prime contractor have a qualified subcontractor to act as the Diversity and Inclusion Manager to oversee DBE participation" and compliance. (*Id.*; *see* Doc. 1-23, #244 (ODOT's Request for Proposals)). ODOT also required that manager to "have at least 10 years of experience" with the DBE requirements. (Doc. 1-25 #355; Doc. 1-23, #244).

---

[1] Because this matter is before the Court on Defendants' motions to dismiss, the Court must accept the well-pleaded allegations in the Complaint as true. *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). So while the Court relies on the Complaint's allegations to recount the case's background, it reminds the reader that they are just that— allegations.

[2] A complaint for a different case was originally uploaded as Document 1. The correct complaint was later added as Document 1-25.

Walsh Construction Company and Kokosing Construction Company, Inc., established a joint venture, Walsh Kokosing Joint Venture II (Walsh Kokosing), to submit a proposal to act as the prime contractor on the Bridge Project. (Doc. 1-25, #355; *see* Mot. to Dismiss, Doc. 23, #527 n.1).[3] Like any construction project, Walsh Kokosing needed sub-contractors, including, as relevant here, one for the Diversity and Inclusion Manager role. (Doc. 1-25, #355). At some point, Walsh Kokosing "identified WEB [Ventures] as a potential suiter to include in its proposal as the Diversity and Inclusion Manager." (*Id.*).

Meanwhile, Plaintiff Jamir Davis and his firm, J. Davis Law Firm, PLLC (JDLF), was a "certified" DBE for purposes of the federal regulations, and he had experience with DBE compliance from his former role as Executive Director of Civil Rights for the Commonwealth of Kentucky. (*Id.* at #339). In that role, he "was responsible for overseeing all aspects of [federal diversity] compliance goals for every federally funded highway construction project" in Kentucky. (*Id.*).

So in early 2023, WEB Ventures and JDLF decided to "jointly pursue the Diversity and Inclusion Manager Position" for the Bridge Project. (*Id.* at #342). To that end, they entered into what they called a Teaming Agreement. (*Id.* at #344–45; Doc. 1-1 (Teaming Agreement)). That Agreement, among other things, stated that

---

[3] The Court cites to the Motion to Dismiss (Doc. 23) only to fill in some seemingly undisputed gaps in the background. Additionally, Walsh Kokosing notes that Walsh Kokosing Joint Venture [I] is an unrelated joint venture, so the proper party here is only Walsh Kokosing Joint Venture *II*. The Complaint names both joint ventures as Defendants. (Doc. 1-25, #332). Davis does not dispute this in his response, so the Court dismisses the first Walsh Kokosing Joint Venture.

"[t]he Parties agree to act in cooperation with each other to jointly pursue a sub contract from the Prime Contractor [Walsh Kokosing] and create the Team structure with Web Ventures as Team Leader and Consultant [JDLF] as Key Services Consultant." (Doc. 1-1, #8). For JDLF's compensation, the parties agreed to a monthly retainer "with a negotiable monthly range from $11,500 to $12,500 not to exceed 60 hours per month." (*Id.* at #16 (cleaned up)). That range works out to approximately $192 to $208 per hour.

Based on that Teaming Agreement, JDLF assisted WEB Ventures with a draft proposal for Walsh Kokosing as well as "hosted weekly meetings, reviewed documents, and attended public meetings." (Doc. 1-25, #345, 350). And WEB Ventures named Davis the Engagement and Compliance Lead. (*Id.* at #349; Doc. 1-16). In the email conferring that title, though, one of WEB Ventures' employees, Defendant Icy Williams, was referred to with a proposed title of Diversity and Inclusion Manager. (Doc. 1-16, #115). Beyond that, JDFL "hired additional staff, terminated a previous part-time contract, and acquired more office space" to prepare for its work on the Bridge Project. (Doc. 1-25, #346–47).

Later that year, on October 3, 2023, WEB Ventures entered into a sub-contract with Walsh Kokosing for the Bridge Project. (Doc. 1-25, #342; Doc. 1-2 (contract)). For the first phrase of the project, Walsh Kokosing provided WEB Ventures an estimated budget, including for Davis. (Doc. 1-25, #342; Doc. 1-3, #20 (budget letter)). Walsh Kokosing stated Davis's hourly compensation as $90 per hour, and with a "direct labor multiplier of 2.8," a total of $252 per hour. (Doc. 1-3, #20–21). While the letter

4

notes that the budget would ultimately be subject to review by the Bridge Project's management team, not just Walsh Kokosing, this appears to have set WEB Ventures' budget. (*Id.* at #20).

## B.    Disputes Begin.

After WEB Ventures signed its sub-contract with Walsh Kokosing and received its preliminary budget, JDLF requested to turn its Teaming Agreement with WEB Ventures into a full-fledged contract. (Doc. 1-25, #351). To that end, JDLF and WEB Ventures met on October 30, 2023. (*Id.* at #342). But at that meeting, WEB Ventures informed JDLF that JDLF's approved hourly rate was only $90, leaving out the labor multiplier. (*Id.*). And this misunderstanding led to a downward spiral in the relationship between the parties and ultimately to this action. JDLF did not accept this low offer, eventually going to arbitration with WEB Ventures, as the Court will detail below. But before getting to that, as a result of JDLF's exit, Williams officially became the Diversity and Inclusion Manager for the Bridge Project. (*Id.* at #341, 349). Davis alleges that Williams "had never performed in that capacity on a [f]ederally funded project before and did not hold the requisite experience." (*Id.* at #341). But Davis claims that placing Williams in the position had been WEB Ventures' plan all along (as perhaps evidenced by the earlier email noted above, which referred to her by that title)—WEB Ventures only used JDLF's experience to acquire the sub-contract and planned to "quickly cut the firm out afterward." (*Id.* at #333).

Beyond that, Davis alleges that Williams took several other actions to disadvantage JDLF. First, Williams alerted JDLF that Walsh Kokosing sought

5

assistance from a certified DBE for commercial property management, and she told Davis that she would pass along JDLF's information for the role. (*Id.* at #350). Davis, however, claims Williams never forwarded his qualifications. (*Id.*). Second, when it came time for WEB Ventures to seek reimbursement from ODOT, Williams never informed JDLF, which allegedly delayed any payment to the firm. (*Id.* at #350–51; *see* Doc. 1-7 (prompt payment claim)).

Davis also alleges that this conspiracy ran deeper. Indeed, he claims that Walsh Kokosing knew that Williams did not have the experience, and so it hired a third-party to "fabricate" her resume. (Doc. 1-25, #333 n.1, 335). In support, Davis attaches emails between Williams and Defendant Arik Quam, Walsh Kokosing's project manager, where they discuss Williams' lack of experience. (*Id.* at #340; Doc. 1-11). At the same time, on January 11, 2024, Walsh Kokosing posted a job opening for the DBE compliance role, with a deadline for bids of March 29, 2024. (Doc. 1-25, #353; Doc. 1-21, #210).[4] Davis claims he attempted to apply for the position by contacting Walsh Kokosing and requesting the RFP requirements, but he claims that it did not respond to that request, thereby preventing him from fully applying for the role. (Doc. 1-25, #353). But the e-mail chain Davis submits as support for his allegations seems to tell a different story. There, Ua Brewer from Walsh Kokosing, the listed contact on the job posting, had followed up with JDLF about its invitation to bid, sought additional information about the firm's capabilities, and stated JDLF

---

[4] In the Complaint, Davis states that Walsh Kokosing re-listed the job posting on February 15, 2024. (Doc. 1-25, #353). But the job posting that Davis submits as an exhibit has a date of January 11, 2024. (Doc. 1-21, #210). The Court follows the date of the underlying evidence.

was added to the contact list for further information about the bidding process. (Doc. 1-22, #214).

After that, Davis alleges that Walsh Kokosing terminated Williams and WEB Ventures entirely and posted a job opening for the Diversity and Inclusion Manager role. (Doc. 1-25, #353). When JDLF learned of the opening, it asked Walsh Kokosing if it could apply, and Walsh Kokosing informed JDLF that it needed to submit a proposal within the week, which JDLF did. (*Id.*). Walsh Kokosing did not ultimately select a consultant for that position though; "Walsh then claimed that the position was no longer available and ODOT gave it permission to self-perform WEB's previous duties." (*Id.* at #354). Despite that, Walsh Kokosing informed JDLF that it still was looking for help with outreach to certified DBEs and that JDLF was welcome to submit a specific proposal for that. (*Id.*). Ultimately, though, Walsh Kokosing told Davis that JDLF was "not the most qualified" and instead hired Make It Plain Consulting. (*Id.*). But Davis alleges that the firm, like WEB Ventures, does not have the requisite experience. (*Id.*). Davis claims that Walsh Kokosing selected Make it Plain, despite it being less qualified, and excluded JDLF because JDLF is a Black-owned business. (*Id.*).

Moreover, Davis asserts that ODOT "enabled the fraud by allowing Walsh to submit William's false qualifications and approving the fabricated resume." (*Id.* at #336). Specifically, "ODOT ignored multiple fraud complaints, overlooked fake credentials submitted by Icy Williams, delayed investigations, and denied public

7

records, and even removed project compliance requirements—all to shield Walsh Kokosing." (*Id.* at #337).

ODOT allegedly undertook this problematic behavior for nefarious reasons: "to exclude qualified Black-owned business." (*Id.* at #338). In support, Davis cites a 2015–16 study, commissioned by ODOT, finding that Black-owned firms received "$0.31 for every dollar they should have earned." (*Id.*). Additionally, Davis argues that ODOT never could have complied with the federal DBE requirements. (*Id.* at #355–56). The requirements are based on the availability of certified DBEs within a certain geographic area, and from there, states set individual project goals. (*Id.*). In Ohio, the statewide goal is to hire DBEs for 15.9% of ODOT's work. (*Id.* at #356). Yet the Bridge Project's goals were only 7–9%. (*Id.*; Doc. 1-23, #227). Davis argues that these low percentages made it "mathematically impossible" to achieve the state goals, and thus the federal requirements, so it was discriminating against Black-owned businesses. (Doc. 1-25, #356). Specifically, Davis points to three ODOT employees as the perpetrators: Defendants Jack Marchbanks, Secretary of ODOT; Lauren Purdy, Deputy Director for the Division of Opportunity, Diversity & Inclusion for ODOT; and Deborah Green, Administrator for the Office of Business and Economic Opportunity for ODOT. (*Id.* at #341, 356). Not only is this purportedly impossible in the aggregate, Davis alleges that JDLF specifically was "denied the opportunity to participate in the [Bridge Project] due to the gross miscalculation of the DBE goal." (*Id.* at #357).

8

## C.    Dispute Resolution Begins.

As noted above, WEB Ventures and JDLF have already arbitrated at least part of the dispute related to the Bridge Project. To expand on that a bit, after WEB Ventures offered JDLF the $90 per hour rate on October 30, 2023, Davis invoked the dispute resolution article, Article 10, of the Teaming Agreement. (Doc. 1-25, #342; Doc. 1-5 (dispute letter)). Article 10 states that the parties will first refer the dispute to senior management to attempt to resolve the issue, and if senior management does not resolve the dispute within 10 business days, then the parties proceed to arbitration. (Doc. 1-1, #11). While the Teaming Agreement does not specify, Davis characterized the arbitration as non-binding when he invoked the provision. (Doc. 1-5, #28).

The following week, WEB Ventures and JDLF met, but WEB Ventures stayed firm at its $90/hour offer. (Doc. 1-25, #342). Davis then directly contacted Walsh Kokosing to discuss JDLF's rate. (*Id.*; Doc. 1-6 (call transcript)). Quam informed Davis that he had been approved at $252/hour and that the $90/hour rate was before the labor multiplier. (Doc. 1-25, #352; Doc. 1-6, #37). Quam suggested that employees are generally paid the pre-labor multiplier rate (here, $90/hour), but independent contractors like JDLF should receive the total ($252/hour). (Doc. 1-6, #37). But when WEB Ventures still refused to budge, Davis filed a complaint with ODOT for WEB Ventures' failure to negotiate in good faith, its failure to pay promptly, and Walsh Kokosing's potential misrepresentation of team qualifications. (Doc. 1-25, #342; Doc. 1-7 (letter from Bridge Project Manager to Walsh Kokosing regarding Davis's complaint)). The Bridge Project Manager investigated and found that Davis had

9

legitimate complaints regarding the failure to negotiate in good faith and the failure to promptly pay JDLF, but they found no evidence that Walsh Kokosing misrepresented any qualifications. (Doc. 1-7).

Around this time, JDLF proceeded to arbitration with WEB Ventures. (Doc. 1-25, #343).[5] In the arbitration proceedings, JDLF "asserted claims for breach of contract, unjust enrichment, tortious interference with a prospective business advantage, fraudulent concealment, constructive fraud, implied duty of good faith and fair dealing, negligent misrepresentation, negligence, negligent infliction of emotional distress, and intentional infliction of emotional distress." (*Id.*). The arbitrator concluded that the Teaming Agreement was unenforceable because it was only an "agreement to agree." (*Id.*; Doc. 1-10, #88 (arbitrator decision)). Davis attempted to dismiss the arbitration on the theory that if the Teaming Agreement is unenforceable then so is its arbitration provision, but the arbitrator rejected that argument. (*See* Doc. 1-10, #88). As for the claims, the arbitrator dismissed most of them, but the unjust enrichment and fraudulent concealment claims proceeded to hearing. (Doc. 1-25, #343). On March 14, 2025, the arbitrator issued a Final Award, holding that "WEB Ventures had been unjustly enriched but did not commit fraud." (*Id.*). And they awarded JDLF $8,212.50 in damages. (Doc. 21-1, #464 (Final Award)). But Davis did not accept that partial win. Instead, JDLF "seeks to vacate the entire arbitration award or, in the alternative, to modify and correct or vacate the denial of its fraud claim." (*Id.* at #344). Indeed, JDLF has already challenged the arbitrator's

---

[5] Davis attached an unsigned and undated arbitration agreement in support. (Doc. 1-8).

decision in the Kenton Circuit Court in Kentucky. (Williams' Mot. to Dismiss, Doc. 21, #436).[6]

**D.      This Lawsuit.**

Several months after the final arbitration award was issued, on June 12, 2025, Davis filed this lawsuit on behalf of himself individually and also on behalf of JDLF. (Doc. 1-25). In his Complaint, he raises twelve causes of action: (1) tortious interference with a prospective business advantage, against Williams, Walsh Kokosing, and Quam; (2) intentional misrepresentation against the same three Defendants; (3) unjust enrichment against those three; (4) fraudulent concealment against the same; (5) negligence, against Williams, Walsh Kokosing, Quam, as well as Marchbanks, Purdy, and Green; (6) a violation of 42 U.S.C. § 1981, against Walsh Kokosing, Quam, Marchbanks, and Purdy; (7) racial discrimination in violation of Title VI, against Walsh Kokosing, Quam, Marchbanks, and Purdy; (8) a violation of 42 U.S.C. § 1983, against Walsh Kokosing, Quam, Marchbanks, and Purdy; (9) a *Monell* claim under 42 U.S.C. § 1983 against ODOT; (10) a conspiracy to interfere with civil rights in violation of 42 U.S.C. § 1985, against Walsh Kokosing, Quam, Marchbanks, Green, and Purdy; (11) civil conspiracy, against Walsh Kokosing and Marchbanks; and (12) denial of access to public records, against ODOT, Marchbanks, Purdy, and Green. (*Id.* at #357–69).

---

[6] The Court could not access the docket of the state case to see its specific procedural history, but the case is still listed as active.

The Defendants have almost all filed motions to dismiss, grouping themselves into three categories. (*See* Docs. 20, 21, 23). First, ODOT and Deborah Green, which the Court will refer to as the Government Defendants, move to dismiss on three grounds: the Court lacks subject matter jurisdiction, they are protected by sovereign immunity, or alternatively, Davis fails to state a claim. (Doc. 20). Second, Williams moves to dismiss based on res judicata grounds, arguing that the claims were arbitrated. (Doc. 21). Third, Walsh Kokosing and Quam, which the Court will call the Walsh Defendants, request dismissal because Davis fails to state a claim against them. (Doc. 23).

Purdy and Marchbanks, however, have not yet been served. While the summonses initially were returned as executed, (Doc. 6), ODOT later sent letters to the Clerk's Office informing the Clerk that ODOT had mistakenly accepted the summonses and complaints on their behalf. (Doc. 10). Marchbanks and Purdy previously worked at ODOT, but they were no longer employed there. (*Id.*). So ODOT could not accept service on their behalf. (*Id.*). As far as the Court can tell, Davis has not taken any further steps to effectuate service on those two defendants.

Davis has responded in part. He responded to the Government Defendants (Doc. 24) and the Walsh Defendants (Doc. 27). His Response to the Walsh Defendants includes a few points that seem to respond to Williams, but he does not address any of her substantive arguments regarding res judicata. All three groups of Defendants have replied, though, (Docs. 25, 30, 31), so the matter is ripe for the Court's review.

12

## LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a "complaint must present sufficient facts to 'state a claim to relief that is plausible on its face.'" *Robbins v. New Cingular Wireless PCS, LLC*, 854 F.3d 315, 319 (6th Cir. 2017) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In assessing plausibility, the Court "construe[s] the complaint in the light most favorable to the plaintiff." *Bassett*, 528 F.3d at 430 (quotation omitted). A court analyzing a motion to dismiss generally must confine its review to the pleadings. *Armengau v. Cline*, 7 F. App'x 336, 343 (6th Cir. 2001). But if the pleadings reference a document that "is integral to the claims," the Court may consider that document "without converting a motion to dismiss into one for summary judgment." *Com. Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327, 335–36 (6th Cir. 2007); Fed. R. Civ. P. 10(c).

Sovereign immunity, meanwhile, "is a jurisdictional defect that should be addressed under Rule 12(b)(1)." *Geomatrix, LLC v. NSF Int'l*, 82 F.4th 466, 478 (6th Cir. 2023) (emphasis removed). "Motions to dismiss for lack of subject matter jurisdiction fall into two general categories: facial attacks and factual attacks." *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994). "A *facial* attack … merely questions the sufficiency of the pleading." *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990) (emphasis in original). The standard for whether a "complaint alleges jurisdiction adequately" is whether it "contains non-conclusory

13

facts which, if true, establish that the district court has jurisdiction over the dispute." *Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 440 (6th Cir. 2012) (cleaned up). "When ruling on a motion to dismiss for lack of standing or a facial challenge to its subject-matter jurisdiction under Rule 12(b)(1), the district court must accept all material allegations of the complaint as true." *Phillips v. Trump*, No. 18-6341, 2019 WL 7372704, at *1 (6th Cir. Nov. 20, 2019).

"On the other hand, when a court reviews a … *factual* attack … no presumptive truthfulness applies to the factual allegations." *Ohio Nat'l Life Ins. Co.*, 922 F.2d at 325. And when reviewing a factual attack on jurisdiction, courts may consider sources outside the pleadings. *Id.* ("[A] trial court has wide discretion to allow affidavits, documents and even a limited evidentiary hearing to resolve disputed jurisdictional facts.").

Additionally, Davis proceeds pro se, which ordinarily means that the Court construes his filings liberally. *Haines v. Kerner*, 404 U.S. 519, 520–21 (1972). But Davis is a practicing attorney, and "the liberal pleading standard for pro se litigants does not invariably apply when the litigant is a licensed attorney." *Spence v. U.S. Dep't of Veterans Aff.*, 109 F.4th 531, 538 (D.C. Cir. 2024); *see Andrews v. Columbia Gas Transmission Corp.*, 544 F.3d 618, 633 (6th Cir. 2008) (holding that the magistrate judge did not abuse their discretion by denying special consideration to pro se plaintiffs who were practicing attorneys). So the Court will hold Davis to the normal standards for "formal pleadings drafted by lawyers." *Haines*, 404 U.S. at 520.

14

## LAW AND ANALYSIS

The three groups of Defendants each moved to dismiss, raising some unique and some overlapping arguments. (*See* Docs. 20, 21, 23). While it takes time to work through each claim and Defendant, the Court comes to the same conclusion as to all: it must dismiss. The Court starts with Williams' preclusion arguments. After that, the Court discusses the Government Defendants' immunity claims. Lastly, the Court considers the Government Defendants' and the Walsh Defendants' arguments that Davis failed to adequately plead the remaining claims against them. Before getting into the merits, though, the Court first must address whether Davis can personally represent JDLF.

### A.    Davis Cannot Represent His Law Firm.

In the Government Defendants' Motion to Dismiss, they acknowledge that Davis can represent himself individually but argue he cannot represent his law firm because he is not admitted to practice law in the Southern District of Ohio. (Doc. 20, #429–30). The Court agrees.

Davis, of course, can proceed pro se and thus represent himself individually. But the rule "providing that 'parties may plead and conduct their own cases personally or by counsel,' does not allow corporations, partnerships, or associations to appear in federal court otherwise than through a licensed attorney." *Rowland v. Cal. Men's Colony, Unit II Men's Advisory Council*, 506 U.S. 194, 202 (1993) (collecting cases); *Doherty v. Am. Motors Corp.*, 728 F.2d 334, 340 (6th Cir. 1984) (citation omitted) ("[A] corporation cannot appear in federal court except through an

15

attorney."). Furthermore, "the right to conduct business in a form that confers privileges, such as the limited personal liability of the owners for tort or contract claims against the business, carries with it obligations[,] one of which is to hire a lawyer if you want to sue or defend on behalf of the entity." *United States v. Hagerman*, 545 F.3d 579, 581–82 (7th Cir. 2008).

Had JDLF been a sole proprietorship, then Davis could have represented the firm because the firm would have no separate legal existence. *RZS Holdings AVV v. PDVSA Petroleo S.A.*, 506 F.3d 350, 354 n.4 (4th Cir. 2007) (citing *Lattanzio v. COMTA*, 481 F.3d 137, 140 (2d Cir. 2007)). JDLF, however, is registered as an LLC in Kentucky.[7] (*See* Doc. 1, #339). That means JDLF has a separate legal existence. So it must be represented in this Court by an attorney who is authorized to practice here. Davis is admittedly an attorney, but he falls short on the latter front—he is not admitted to practice in the Southern District of Ohio.

Davis does not contest this issue and instead responded that he had "been in communication with licensed counsel," presumably about securing representation. (Resp., Doc. 24, #577). But Davis provided that information back on August 21, 2025, and to the Court's knowledge, has not obtained counsel since then. Or at least no counsel has filed an appearance on behalf of JDLF.

---

[7] *Business Entity Search*, Kentucky Secretary of State, https://sosbes.sos.ky.gov/BusSearchNProfile/Profile.aspx?ctr=1036556.

As a result, the Court grants Plaintiffs twenty-one days to show cause in writing why JDLF should not be dismissed for failure to prosecute. The Court will proceed to analyze the claims, but only with respect to Davis individually.

**B.     Res Judicata Bars the Claims Against Willliams.**

Davis raises a slew of claims against Williams, who is a WEB Ventures employee, but does not directly sue WEB Ventures itself. Specifically, Davis asserts five causes of action against Williams: (1) tortious interference with a prospective business advantage; (2) intentional misrepresentation; (3) unjust enrichment; (4) fraudulent concealment; and (5) negligence. (Doc. 1-25, #357–61). The problem with these claims is that Davis, acting as JDLF, already asserted them against Williams' employer, WEB Ventures, in arbitration. (Doc. 1-25, #343). Because an arbitrator already issued a final decision on these claims, Williams moves to dismiss all counts against her as barred by res judicata. (Doc. 21, #437–45).

The Court finds that res judicata bars these claims. Indeed, Davis does not even meaningfully respond to Williams' arguments. At most, he quibbles with Williams' characterization of the facts. (*See* Doc. 27, #597–98). And Davis himself relies on the arbitrator's decision at times. (*See, e.g.*, *id.* at #609 ("The unjust enrichment award in arbitration further confirms …")). Davis's failure to respond to Williams' arguments poses a problem for him—"failure to respond constitute[s] a waiver of any argument that [] dismissal [is] improper." *Akaazua v. Walker Novak Legal Grp.*, No. 19-2183, 2021 WL 4097500, at *1 (6th Cir. Jan. 8, 2021) (citing *Allstate Ins. Co. v. Glob. Med. Billing, Inc.*, 520 F. App'x 409, 412 (6th Cir. 2013)). As

17

a result, the Court could dismiss the claims against Williams on this ground alone. This is especially true given that, while Davis is technically pro se, he is an attorney, so he is at least arguably subject to a higher standard than the typical pro se litigant. That said, the Court concludes that the better route to follow before dismissing a defendant entirely is to conduct at least a brief review.

Conducting that review, however, requires the Court to start with a choice-of-law question. "When deciding whether to afford preclusive effect to a state court judgment, the Full Faith and Credit Act, 28 U.S.C. § 1738, requires the federal court to give the prior adjudication the same preclusive effect it would have under the law of the state whose court issued the judgment." *Stemler v. Florence*, 350 F.3d 578, 586 (6th Cir. 2003) (citations omitted). Clouding that question here, though, the previous "judgment" is an arbitral award. "The source of the law that governs the preclusion consequences of an arbitration award has not been much developed." *Flynn v. Credit Acceptance Corp.*, No. 2:21-cv-7019, 2023 WL 3321762, at *2 (C.D. Cal. Jan. 18, 2023) (quoting 18B Wright, Miller, & Cooper, *Federal Practice and Procedure: Jurisdiction* § 4475.1 (3d ed. April 2022)). Despite that, "[s]tate law [] seems to be consulted when an award that has not been confirmed is presented to a federal court in an action that involves a state-law claim." 18B Wright, Miller, & Cooper, *Federal Practice and Procedure: Jurisdiction* § 4475.1 (3d ed. April 2022). The five counts asserted here, as well as all the claims raised in arbitration, are state-law claims. (*See* Doc. 1-25, #343, 357–61). So state law, here Ohio law, seems applicable. Further supporting that result, Williams bases her res judicata argument on Ohio law, and Davis has forfeited

any opportunity to argue that a different state's laws should apply. *See Masco Corp. v. Wojcik*, 795 F. App'x 424, 427 (6th Cir. 2019) (citing *Wood v. Mid-Valley, Inc.*, 943 F.2d 425, 426–27 (7th Cir. 1991) ("[Courts] regularly rely on the litigants' agreement[s] about the governing law (or, more often, on one litigant's failure to dispute the issue) to avoid deciding what could be knotty choice-of-law questions."). So the Court will apply Ohio law.

Under Ohio law, a party invoking res judicata must establish four elements: (1) a final decision on the merits; (2) the prior action involved the same parties (or their privies) as the parties currently before the Court; (3) the current action raises "claims that were or could have been litigated in the first action"; and (4) both actions "arise out of the same transaction or occurrence." *William Powell Co. v. Nat'l Indem. Co.*, 18 F.4th 856, 869–70 (6th Cir. 2021) (cleaned up). The Court addresses each below.

### 1. Final Decision on the Merits.

Start with whether the previous arbitral award constituted a final decision on the merits. The answer appears to be yes—"federal courts ordinarily give preclusive effect to arbitrations." *Cent. Transp., Inc. v. Four Phase Sys., Inc.*, 936 F.2d 256, 259 (6th Cir. 1991); *see also In re Robinson*, 256 B.R. 482, 488 (Bankr. S.D. Ohio 2000) (collecting cases to show that "arbitration awards, even those that have not been court confirmed, are entitled to preclusive effect"). True, Davis has challenged the arbitration award in a Kentucky state court. (Doc. 21, #433). As far as the Court is aware, that case is still ongoing. But "it is well established that a final trial court

19

judgment operates as *res judicata* while an appeal is pending." *Commodities Exp. Co. v. U.S. Customs Serv.*, 957 F.2d 223, 228 (6th Cir. 1992) (collecting cases). "Nor does the preclusive effect of the [trial court]'s determination depend upon the correctness of the decision, for even erroneous judgments are accorded *res judicata* effect." *Id.* (citing *Angel v. Bullington*, 330 U.S. 183, 187 (1947)). The Court sees no reason why those general rules about the preclusive effect of earlier judgments should be any different for arbitral awards. So even though a challenge to the arbitration award is pending, the Court concludes the award is a final judgment for res judicata purposes.

### 2. Privity.

Next, the question is whether the parties here are in privity with the parties to the arbitration such that the judgment binding them also binds the parties here. To establish privity, parties "need only have 'a mutuality of interest, including an identity of desired result.'" *Bus. Dev. Corp. of S.C. v. Rutter & Russin, LLC*, 37 F.4th 1123, 1136 (6th Cir. 2022) (quoting *Brown v. City of Dayton*, 730 N.E.2d 958, 962 (Ohio 2000)). Ohio favors a "broad definition" of the term whereby the parties need only "share a 'close enough' relationship that it would serve preclusion law's purposes to apply the doctrine even though the parties are technically distinct." *Id.* (citations omitted). In other words, a party is in privity if it reaches through the litigant in the earlier proceeding to assert (what would effectively be the prior litigant's) interests against the defendant, or conversely, defenses against the plaintiff. *See Brown*, 730 N.E.2d at 962.

The earlier arbitration involved JDLF and WEB Ventures LLC, (Doc. 21-1, #453), so the Court needs to confirm privity on both sides. On the plaintiff side, Davis is clearly in privity with his firm JDLF. While they are distinct legal entities, Davis is the president of JDLF and, so far as the Court can tell, the only lawyer at the firm. (Doc. 1-25, #339; Doc. 21, #447); *see also* Our Team, *J. Davis Law Firm*, https://jdaviscounsel.com/our-team. So the Court agrees that "Davis controlled and directed JDLF through its business arrangements with WEB, prior business relationship with Ms. Williams, and through the foregoing dispute." (Doc. 21, #447). On top of that, Davis and JDLF desired the same outcome in that earlier litigation (and here). Thus, the Court finds privity exists between Davis and JDLF.

On the defendants' side, the Court likewise finds privity between Williams and WEB Ventures. Williams, as WEB Ventures' employee, was involved in the arbitration proceedings, and "her testimony was used as evidence." (Doc. 21, #440). Many of the core facts underlying the claims in the arbitration involved Williams' conduct. (*See* Doc. 21-4, #494–95 (arbitration complaint)). And conversely, many of the claims here involve WEB Ventures' conduct. While there may be instances where an employer and employee should not be considered in privity for res judicata purposes, Ohio courts have found privity between them when the same plaintiff raised "'virtually identical' claims against each party," and the employee and employer desired the same result. *See Elec. Enlightenment, Inc. v. Kirsch*, 2008-Ohio-3633, ¶ 11 (9th Dist.). The Court finds that is true here.

### 3. Same Transaction or Occurrence.

The Court skips ahead to the final element, whether both actions arise out of the same transaction or occurrence. That element is easily satisfied here. As Davis himself explains, he initiated arbitration because of his disagreements with WEB Ventures, and specifically its employee Williams, over the Teaming Agreement and the work Davis planned to do for the Bridge Project. (*See* Doc. 1-25, #342–43). The present case involves the same fact pattern, so the two suits have an obvious "logical relation[ship]." *Bus. Dev. Corp. of S.C.*, 27 F.4th at 1133 (quoting *Rettig Enters., Inc. v. Koehler*, 626 N.E.2d 99, 103 (Ohio 1994)).

### 4. Claims that Were or Could Have Been Raised Earlier.

That leaves prong three, which asks whether the claims raised in the current suit were or could have been raised in the earlier lawsuit. The short answer here is yes. Davis states that his arbitration complaint "asserted claims for breach of contract, unjust enrichment, tortious interference with a prospective business advantage, fraudulent concealment, constructive fraud, implied duty of good faith and fair dealing, negligent misrepresentation, negligence, negligent infliction of emotional distress, and intentional infliction of emotional distress." (Doc. 1-25, #343; *see* Doc. 21-4 (arbitration complaint)). Here, against Williams at least, Davis asserts five counts: (1) tortious interference with a prospective business advantage; (2) intentional misrepresentation; (3) unjust enrichment; (4) fraudulent concealment; and (5) negligence. (Doc. 1-25, #357–61). The arbitration included all five of these claims and then some, based on nearly identical allegations that Davis currently

22

raises about Williams' (and really WEB Ventures') overall failure to include Davis (and really JDLF) in its work on the Bridge Project.

The only potential exception is that here, Davis raises a claim for *intentional* misrepresentation, while in arbitration, he asserted a claim for *negligent* misrepresentation. (*Compare* Doc. 1-25, #358–59, *with* Doc. 21-4, #508). But any related theory of substantive law that equally arises from the same factual background that existed at the time of the previous suit could have been brought in that earlier action. *Grava v. Parkman Twp.*, 653 N.E.2d 226, 230 (Ohio 1995). Negligent and intentional misrepresentation are certainly related theories of law, and here, they involve the same allegations. In the arbitration, Davis argued that WEB Ventures led JDLF to believe that it would be an "integral part of its team, that JDLF was going to be involved in the project from start to finish and that WEB would communicate JDLF's qualifications" to Walsh Kokosing for consideration for other project roles. (Doc. 21-4, #508). And here, Davis claims that Williams "made false representations to [Davis that he] would be utilized as part of the team" and "recklessly communicated false or mislead information to [Davis] and refused to use [Davis] as promised." (Doc. 1-25, #358). The phrasing of part of the misrepresentation claim here is different because it also involves allegations against Walsh Kokosing and Quam, (*id.*), but the allegations regarding *Williams'* conduct are the same as that underlying the misrepresentation claim at arbitration. Thus, Davis could have brought this claim previously.

23

Putting that all together, the Court concludes that res judicata bars all five claims against Williams here. The Court thus grants Williams' Motion to Dismiss (Doc. 21) and dismisses those claims with prejudice.

## C. ODOT and Green Are Immune for Some, but Not All, Claims.

Now turn to the Government Defendants, ODOT and Deborah Green. Recall, Davis asserts five claims against them: (1) negligence, against Green (Count 5); (2) racial discrimination in violation of Title VI, 42 U.S.C. § 2000d et seq., against ODOT (Count 7);[8] (3) a *Monell* claim under 42 U.S.C. § 1983, against ODOT (Count 9); (4) conspiracy to interfere with civil rights in violation of 42 U.S.C. § 1985, against Green (Count 10); and (5) denial of access to public records, against Green and ODOT (Count 12). (Doc. 1-25, #360–66, 368–69). And Davis sues Green in both her individual and official capacities. (*Id.* at #332).

The Government Defendants argue dismissal is appropriate here because they are immune from these claims, or alternatively, because Davis fails to provide sufficient factual allegations. (Doc. 20, #421–29). The Court only addresses the immunity arguments in this section. Ultimately, the Court finds that the Government Defendants are immune for Counts 5, 9, and 12, but not for the Title VI claim (Count 7). The Court will address the adequacy of Davis's pleading for the Title VI claim (Count 7) and the conspiracy under § 1985 claim (Count 10) in the following section.

---

[8] Davis does not name ODOT in the heading for Count 7. As ODOT points out, however, the allegations supporting the claim involve it. (Doc. 20, #423 (citing Doc. 1-25, #362–63)). So the Court analyzes the Title VI claim with respect to ODOT, too.

24

### 1. State-Law Claims.

The Court begins with Davis's two state-law claims against the Government Defendants: negligence against Green (Count 5), and the denial of access to public records in violation of Ohio Revised Code § 149.43, against both Green and ODOT (Count 12). (Doc. 1-25, #360–61, 368–69). The Court concludes it lacks subject matter jurisdiction over these state-law claims.

### a. ODOT and Green in Her Official Capacity.

"Congress has not abrogated the Eleventh Amendment for state law claims, nor has Ohio waived sovereign immunity." *McCormick v. Miami Univ.*, 693 F.3d 654, 664 (6th Cir. 2012) (citation omitted). This immunity extends to state agencies as well. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). The Eleventh Amendment also bars suit against Green in her official capacity because official capacity suits against state officials are suits against their employer—the state. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). Because states enjoy immunity from suit in federal court, that immunity extends to state officials sued in their official capacities, at least as to claims for money damages. *Pennhurst State Sch. & Hosp.*, 465 U.S. at 100–02; *see Experimental Holdings, Inc. v. Farris*, 503 F.3d 514, 520–21 (6th Cir. 2007) ("[P]endent state law claims against state officials in their official capacity are barred by the Eleventh Amendment.").

25

The Supreme Court has recognized an exception to this Eleventh Amendment immunity doctrine under *Ex parte Young*, 209 U.S. 123 (1908).[9] That exception applies to private suits brought against state officers demanding prospective equitable relief. *Green v. Mansour*, 474 U.S. 64, 68 (1985). But the exception "has no application in suits against the States and their agencies, which are barred regardless of the relief sought." *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993) (citing *Cory v. White*, 457 U.S. 85, 90–91 (1982)).

Here, Davis requests only money damages with regard to the negligence claim against Green. (Doc. 1-25, #362 (requesting compensatory damages)). So the Court dismisses the negligence claim against Green in her official capacity. As for the public-records claim, Davis does seek injunctive relief to "compel[] the production of the requested records." (*Id.* at #369). Because the *Ex parte Young* exception does not apply to suits against state agencies, though, the Court dismisses this claim as against ODOT. The exception does, however, mean the suit against Green in her official capacity is not dismissed on immunity grounds.

But the Court finds it lacks subject-matter jurisdiction anyway under Ohio Revised Code § 2743.75(A). That statute states that "the court of claims shall be the sole and exclusive authority in this state that adjudicates or resolves complaints based on alleged violations of [Ohio's Public Records Act, § 149.43]." Ohio Rev. Code § 2743.75(A). That section expressly states its purpose is "to provide for an

---

[9] Davis technically only argues *Ex parte Young* applies with respect to his § 1983 *Monell* claim. (Doc. 24, #570–72). But the Court analyzes it here as well because Davis requests injunctive relief on the public-records claim. (Doc. 1-25, #369).

expeditious and economical procedure" to resolve public-records disputes. *Id.* Allowing suit in federal court would run contrary to this language and express purpose. So Davis "must seek such relief in the state courts as provided by the statute." *Gillespie v. O.D.R.C.*, No. 1:25-cv-1562, 2025 WL 2459512, at *1 (N.D. Ohio Aug. 27, 2025); *see Glaze v. Horton*, 4:24-cv-1815, 2025 WL 359299, at *3 (N.D. Ohio Jan. 31, 2025). Therefore, Davis cannot seek injunctive relief for this claim in this Court either. Putting that all together, Davis cannot recover any form of damages against ODOT or Green in her official capacity.

### b.     Green in Her Individual Capacity.

Turning to the individual capacity side, "state law claims against [a state employee] in their individual capacity are barred under the Ohio Revised Code §[] 9.86" unless the Ohio Court of Claims has determined otherwise under Ohio Revised Code § 2743.02(F). *McCormick.*, 693 F.3d at 664–65 (citing Ohio Rev. Code § 2743.02(F)); *Haynes v. Marshall*, 887 F.2d 700, 705 (6th Cir. 1989) ("Ohio law requires that, as a condition precedent to asserting a cause of action against a state employee in h[er] individual capacity, the Court of Claims must first determine that the employee is not entitled to the immunity provided for in Revised Code section 9.86."). Davis has not alleged that he pursued these claims in the Ohio Court of Claims, let alone that that court found Green is not immune. Thus, as things stand, this Court lacks jurisdiction to hear Davis's claims against Green in her individual capacity. *See McCormick*, 693 F.3d at 665 (describing this requirement as

jurisdictional). So the Court dismisses both state-law claims against Green in her individual capacity as well.

Davis raises several arguments against this conclusion. First, he argues that the negligence claim is not a "purely pendent state-law" claim, but rather is "intertwined with ongoing federal constitutional violations." (Doc. 24, #573 (citing *Harper v. AutoAlliance Int'l Inc.*, 392 F.3d 195, 209 (6th Cir. 2004)). But *Harper* did not involve questions of immunity; it analyzed whether the plaintiff's state-law claim was "inextricably intertwined" with a collective bargaining agreement's provisions such that it was preempted by a federal statute. 362 F.3d at 209. So Davis is attempting to apply a test from a far different realm to the immunity and jurisdictional issue here. The Court is not persuaded.

Second, Davis argues that Green acted outside the scope of her employment, so she is not immune. (Doc. 24, #573 (citing *Theobald v. Univ. of Cincinnati*, 857 N.E.2d 573, 577 (Ohio 2006))). This argument perhaps has stronger legal footing, but it still misses the mark. "The Court of Claims has exclusive, original jurisdiction to determine whether a state employee is personally immune from liability in a civil action under R.C. 9.86 or whether the conduct was manifestly outside the scope of employment at the time the cause of action arose." *Theobald*, 857 N.E.2d at 577 (citing first Ohio Rev. Code § 2743.02(F); and then citing *Johns v. Univ. of Cincinnati Med. Ass'n, Inc.*, 804 N.E.2d 19, 24 (Ohio 2004)). In short, Davis may be (or may not be) correct that Green acted outside the scope of her employment and is thus not

entitled to immunity. But that is simply not a question this Court is empowered to decide.

Thus, the Court dismisses the negligence claim (Count 5) and the public-records claim (Count 12) against ODOT and Green in both her official and individual capacities. But because Davis could perhaps pursue some or all of these claims in a different forum, the Court dismisses the claims without prejudice.

### 2. Racial Discrimination in Violation of Title VI.

Next, Davis raises a claim of racial discrimination in violation of Title VI, 42 U.S.C. § 2000d et seq., against ODOT. (Doc. 1-25, #362–63). ODOT makes several arguments for dismissal of this claim, but the Court only addresses the immunity one at this point. (Doc. 20, #424–25).

As the Court explained above, "[t]he Eleventh Amendment … bars an action for damages in a federal court against a State, unless Congress has abrogated its sovereign immunity or the State has expressly waived it." *Lee Testing & Eng'g, Inc. v. Ohio Dep't of Transp.*, 855 F. Supp. 2d 722, 725 (S.D. Ohio 2012) (citing *Va. Off. For Protection & Adv. v. Stewart*, 563 U.S. 247, 253–54 (2011)). And "Ohio has not waived its Eleventh Amendment immunity from suits for money damages in federal court." *Id.* at 726 (citing first Ohio Rev. Code § 2743.03; and then *Turker v. Ohio Dep't of Rehab. & Corr.*, 157 F.3d 453, 457 (6th Cir. 1998)).

Congress, however, abrogated states' immunity for Title VI claims. The relevant statute, 42 U.S.C. § 2000d-7, expressly states that "[a] state shall not be immune under the Eleventh Amendment … from suit in Federal court for a violation

29

of … title VI of the Civil Rights Act of 1964." In case there were any doubt, the Supreme Court confirmed that Congress "expressly abrogated States' sovereign immunity against suits brought in federal court to enforce Title VI and provided that in a suit against a State 'remedies (including remedies both at law and in equity) are available … to the same extent as such remedies are available … in the suit against any public or private entity other than a State." *Alexander v. Sandoval*, 532 U.S. 275, 280 (2001) (quoting 42 U.S.C. § 2000d-7). In sum, ODOT is not immune from Davis's claim of racial discrimination under Title VI.

ODOT tries to contest this. It relies on *Sossamon v. Texas*, 563 U.S. 277 (2011), to argue that "courts are split" as to whether states retain their sovereign immunity. (Doc. 20, #424–25). But the Court is not persuaded any such split exists. First, *Sossamon* involved a claim under the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA). *Sossamon*, 563 U.S. at 280. The Supreme Court held that § 2000d-7 did not abrogate states' immunity for RLUIPA claims because that statute (i.e., § 2000d-7) only applies to "Federal statute[s] prohibiting *discrimination*." *Id.* at 291 (citing § 2000d-7) (emphasis added). RLUIPA, meanwhile, prohibited "substantial burdens on religious exercise," which the Supreme Court held was different than prohibiting discrimination. *Id.* at 292.

For Title VI, however, a plaintiff need not argue that the statute fits into the general clause abrogating sovereign immunity as to statutes prohibiting discrimination, like the plaintiff needed to for RLUIPA in *Sossamon*. That is because § 2000d-7 expressly covers Title VI. So *Sossamon*'s concerns about identifying the

bounds of § 2000d-7 as to statutes it does not expressly address (like RLUIPA) carry no weight here. Moreover, ODOT elsewhere relied on a case that, while it dismissed § 1983 claims against Ohio on immunity grounds, held that § 2000d-7 expressly abrogated states' sovereign immunity for Title VI claims. *Lee Testing & Eng'g*, 855 F. Supp. 2d at 726. Thus, Congress has abrogated Ohio's, and therefore ODOT's, immunity for claims under Title VI.

Because ODOT is not immune, the Court must separately address whether Davis has stated a viable claim. But rather than address that question here, the Court considers it below in coordination with its analysis of the Walsh Defendants' arguments. *See* infra Part D.2.

### 3. *Monell.*

Last, for arguments that sound in immunity at least, Davis asserts a *Monell* claim, but only against ODOT. (Doc. 1-25, #364–65). *Monell* established that municipalities and local governments are "persons" and so can be sued under 42 U.S.C. § 1983. *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 690 (1978). But "neither a State nor its officials acting in their official capacities are 'persons' under § 1983." *Will*, 491 U.S. at 71; *see also Alkire v. Irving*, 330 F.3d 802, 814 (6th Cir. 2003) (citation omitted) ("Unlike states, however, local governments, municipalities, and counties are considered 'persons' within the meaning of 42 U.S.C. § 1983."). ODOT is an arm of the state. So it does not fall within the scope of § 1983, and furthermore, is not the proper subject of a *Monell* claim. Accordingly, the Court dismisses this claim, Count 9, with prejudice.

**D.** **The Federal Claims Against the Walsh Defendants and the Government Defendants Fail as a Matter of Law, So the Court Declines to Exercise Supplemental Jurisdiction over the State-Law Claims.**

With the preclusion and immunity issues settled, the Court finally turns to the sufficiency of Davis's pleadings. Specifically, the remaining claims include the Title VI claim against ODOT, the § 1985 conspiracy claim against Green, and the various claims against Walsh Kokosing and its project manager, Arik Quam. More specifically, Davis asserts ten causes of action against Walsh Kokosing and Quam: (1) tortious interference with a prospective business advantage; (2) intentional misrepresentation; (3) unjust enrichment; (4) fraudulent concealment; (5) negligence; (6) a violation of 42 U.S.C. § 1981; (7) racial discrimination under Title VI (the same claim Davis asserts against ODOT); (8) a violation of 42 U.S.C. § 1983; (9) conspiracy to interfere with civil rights, in violation of 42 U.S.C. § 1985 (a conspiracy which also allegedly includes Green); and (10) civil conspiracy, but against Walsh Kokosing alone. (Doc. 1-25, #357–67). The Walsh Defendants now move to dismiss all ten claims against them for failure to state a claim. (Doc. 23). The Court starts with the federal claims, and because the Court concludes that all of the federal claims must be dismissed, it declines to exercise supplemental jurisdiction over the remaining state-law claims. Thus, the Court grants the Walsh Defendants' Motion to Dismiss (Doc. 23) and the remainder of the Government Defendants' Motion (Doc. 20).

**1.** **Count 6 – 42 U.S.C. § 1981, against the Walsh Defendants.**

Section 1981 extends to "[a]ll persons" certain equal rights as are "enjoyed by white citizens." 42 U.S.C. § 1981. To succeed on a claim under § 1981, a plaintiff must

demonstrate, among other things, that they are "subject to discrimination based on their race" and that the defendant "intended to discriminate against him on the basis of race." *Amini v. Oberlin Coll.*, 440 F.3d 350, 358 (6th Cir. 2006). To establish a claim of race-based discrimination under § 1981, the Court applies the *McDonnell Douglas* burden-shifting framework when there is no direct evidence of discrimination, as here. *TLC Realty 1 LLC v. Belfor USA Group, Inc.*, 166 F. Supp. 3d 919, 925 (S. D. Ohio 2016) (citing *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008)). And under that framework, to advance beyond summary judgment as to a discrimination claim based on indirect evidence, Davis would need to establish (1) he is a member of a protected class, (2) the defendant took an adverse action against him, (3) he was qualified for the position, and (4) he was treated differently than similarly-situated sub-contractors, or replaced by a sub-contractor, outside of his protected class. *Id.*; *Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241, 1246 (6th Cir. 1995) (citing *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582–83 (6th Cir. 1992)).

But this case is only at the pleading stage. And the Sixth Circuit has made clear that *McDonnell Douglas* does not impose a pleading requirement. *See Keys v. Humana, Inc.*, 684 F.3d 605, 609 (6th Cir. 2012); *Savel v. MetroHealth Sys.*, 96 F.4th 932, 944 (6th Cir. 2024). Rather, the only question is whether the complaint "plead[s] sufficient facts from which the court could plausibly conclude" that the Defendants discriminated against Davis based on his race. *Savel*, 964 F.4th at 943 (cleaned up). Still, as this Court has observed, the *McDonnell Douglas* framework creates something of a backdrop against which the Court can assess plausibility. *See Southall*

33

*v. Ford Motor Co.*, 645 F. Supp. 3d 826, 833–34 (S.D. Ohio 2022); *Finley v. Miami Univ.*, 1:19-cv-984, 2022 WL 293476, at \*4 (S.D. Ohio Feb. 1, 2022). Stated differently, one way to meet the pleading standard would be through allegations that, if true, show that the plaintiff could make out a prima facie case. In other words, plausibly alleging facts supporting each of the prima facie elements is a sufficient, but not a necessary, condition for proceeding past a motion to dismiss.

The Walsh Defendants acknowledge that Davis "likely satisf[ies] the first three prongs." (Doc. 23, #546). They dispute, however, that he was replaced by someone outside of his protected class. (*Id.*). Specifically, they claim that they hired Make It Plain Consulting for the DBE compliance role, and Make It Plain Consulting is also a Black-owned business like JDLF, the firm that Davis owns. (*Id.* at #547). Davis's response barely touches on his § 1981 claim. (*See* Doc. 27, #621–23). While he titles the subsection, "Defendants' Intentional Contracting Discrimination Violates 42 U.S.C. § 1981," the actual argument only addresses his Title VI claim. (*Id.*). So the Walsh Defendants' argument is unopposed.

Especially given Davis's failure to respond, the Court agrees with the Defendants that Davis has not offered sufficient factual allegations to adequately plead that he was treated differently from, or replaced by, others outside of his protected class. Admittedly, for this claim, he asserts that he was "denied services, support, and opportunities while similarly situated contractors were not subjected to the same treatment." (Doc. 1-25, #362). And elsewhere, he alleges that "Walsh does not subject similarly situated, qualified white-owned firms to this type of disparate

34

treatment and specifically targeted JDLF for exclusion because it is a Black-Owned [DBE]." (*Id.* at #354).[10] But these are conclusory allegations without any factual allegations describing how some other person or other company was similarly situated to Davis. Such conclusory allegations do not suffice to overcome a motion to dismiss. *Terry v. Tyson Farms, Inc.*, 604 F.3d 272, 276 (6th Cir. 2010) (quotation omitted) ("We need not accept as true legal conclusions or unwarranted factual inferences, and conclusory allegations or legal conclusions masquerading as factual allegations will not suffice.").

The only specific replacement that Davis mentions elsewhere in his Complaint is how Walsh Defendants hired Make It Plain Consulting instead of JDLF. (Doc. 1-25, #354; Doc. 23, #547). But Make It Plain Consulting is a Black-owned business, like JDLF. (Doc. 23, #547).[11] So he has not plausibly alleged that he could make his prima facie showing under *McDonell Douglas*. Nor has he argued any other basis on

---

[10] Davis mentions disparate treatment here, but Title VI does not create a private cause of action to sue for discrimination based on disparate impact. *See Alexander*, 532 U.S. at 289. Davis appears to concede this by noting that "*Sandoval* foreclosed private actions based solely on disparate impact regulations." (Doc. 27, #621).

[11] The Court takes judicial notice of this fact. "[A] court may take judicial notice of undisputed facts without requiring a conversion" to a summary judgment motion. *Burns v. United States*, 542 F. App'x 461, 467 (6th Cir. 2013). While this kind of fact is not the run-of-the-mill public record normally the subject of judicial notice, the Court finds it is undisputed. Davis does not allege whether or not Make It Plain Consulting is Black-owned in his Complaint, only that it was unqualified for the position. (Doc. 1-25, #354). Davis also had an opportunity to dispute this in his Response, but he did not present any argument for his § 1981 claim, nor mention Make It Plain Consulting at all. (*See* Doc. 27).

The Court does not simply take the Walsh Defendants' word for it either. *See* Make It Plain Consulting, *The Voice of Black Cincinnati*, https://thevoiceofblackcincinnati.com/black-owned-business/make-it-plain-consulting-llc/, last visited March 25, 2026.

35

which he has plausibly alleged a claim under § 1981 against the Walsh Defendants. Accordingly, the Court dismisses that claim.

### 2.    Count 7 – Racial Discrimination in Violation of Title VI.

Davis also asserts a similar claim of racial discrimination in violation of Title VI, 42 U.S.C. § 2000d et seq. (Doc. 1025, #362–63). But he asserts this claim against both the Walsh Defendants and ODOT. In seeking dismissal, the Walsh Defendants argue that Davis's allegations of intentional discrimination "consist of nothing more than legal conclusions." (Doc. 23, #550 (citing *Foster v. Mich.*, 573 F. App'x 377, 389 (6th Cir. 2014)). Similarly, ODOT argues "none of [Davis's] allegations contain specific, non-conclusory facts supporting the inference that ODOT acted because of racial animus or with discriminatory purpose." (Doc. 20, #423–24). Davis says that is not so. He maintains that he alleged "deliberate acts intended to exclude [him] on the basis of race." (Doc. 27, #622). These acts include excluding JDLF from Bridge Project opportunities, "conceal[ing] material information regarding reimbursement, refus[ing] to release information about open compliance positions, and structur[ing] opportunities in ways that disadvantaged JDLF," such as not providing the same amount of time to apply. (*Id.* at #621–22).

Title VI prohibits only intentional discrimination. *Alexander*, 532 U.S. at 280–81. Evidence of intentional discrimination may be direct or indirect. *Paasewe v. Ohio Arts Council*, 74 F. App'x 505, 507–08 (6th Cir. 2003). "Direct evidence generally requires unmistakable verbal assertions that the plaintiff was treated adversely because of his race." *Id.*(citing *Smith v. Chrysler Corp.*, 155 F.3d 799, 805 (6th Cir.

36

1998)). The Walsh Defendants' argument is correct in that Davis fails to offer any direct evidence because he "make[s] no assertions as to how any of the alleged actions relate to his race." (Reply, Doc. 31, #694).

Davis could theoretically rely on indirect evidence instead. In such cases, courts in this circuit have most often borrowed the *McDonnell Douglas* burden-shifting framework. *See, e.g.*, *Johnson v. City of Clarksville*, 186 F. App'x 592, 595 (6th Cir. 2006) (assuming without deciding that the *McDonnell Douglas* framework applies); *Paasewe*, 74 F. App'x at 507 (applying the *McDonnell Douglas* framework); *Ali v. Univ. of Louisville*, No. 3:17-cv-638, 2019 WL 539098, at *5–6 (W.D. Ky. Feb. 11, 2019) (same).

As discussed above, though, Davis fails to allege facts under which he could meet the fourth element of the *McDonnell Douglas* framework: whether he was treated differently from similarly situated contractors who are not in his protected class or replaced by someone outside his protected class. *See* supra Part D.2. And once again, he fails to establish a non-*McDonnell Douglas* based reason to find his claims plausible.[12] So the Court need not evaluate this claim further, and instead dismisses this claim against the Walsh Defendants and ODOT.

---

[12] In Davis's Response to the Government Defendants, he refers to proving intentional discrimination via direct or circumstantial evidence according to *Village of Arlington Heights v. Metro Housing Development Corporation*, 429 U.S. 252 (1977). (Doc. 24, #569). This Court has previously considered arguments regarding a Title VI claim under this framework. *See Saqr v. Univ. of Cincinnati*, No. 1:18-cv-542, 2021 WL 6064354, at *4–5 (S.D. Ohio Dec. 22, 2021). But the *Arlington Heights* standard involves consideration of a number of factors "including the historical background of a decision (especially if it reveals a pattern of unfavorable treatment of members of the group in question), the sequence of events leading up to the decision (especially if that sequence departs from normal procedures), departures

### 3.    Count 8 – 42 U.S.C. § 1983.

Next, Davis raises another claim for racial discrimination, this time under 42 U.S.C. § 1983, against the Walsh Defendants. (Doc. 1-25, #363–64).[13] But this claim fails for the simple reason that the Walsh Defendants are not state actors.

Section 1983 provides a cause of action for private individuals to sue "[e]very person who, under color of any statute … subjects, or causes to be subjected, any citizen … to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. But generally speaking, § 1983 only applies to state actors—it doesn't "prohibit the conduct of private parties acting in their individual capacities." *Snodgrass-King Pediatric Dental Assocs., P.C. v. DentaQuest USA Ins. Co.*, 780 F. App'x 197, 204 (6th Cir. 2019) (quotation omitted). The general rule, however, gives way in three situations: (1) when the private entity's conduct "concern[s] traditionally exclusive governmental functions"; (2) when the private entity's conduct "reflect[s] entwinement, a nexus or joint action with state officials"; and (3) when the private entity's conduct "involve[s] compulsion by the government." *Ciraci v. J.M. Smucker Co.*, 62 F.4th 278, 281–82 (6th Cir. 2023). In those three

---

from established substantive standards for a decision (especially where those standards would have led to a different outcome), and any statements that might shed light on the intent of members of the decisionmaking body." *Id.* Davis abjectly fails to mention any of these factors, let alone argue that he sufficiently pleaded factual allegations regarding them. At most, he mentions the 2015–16 study showing that "Black-owned firms received only 31 cents for every contract dollar they should have expected." (Doc. 24, #568). This potentially could fit into the historical background of ODOT and its contracting decisions. But Davis fails to develop this argument any further, and without more, it does not work to overcome the motion to dismiss.

[13] Curiously, Davis does not assert this claim against ODOT or Green, though they are state actors. Davis does name Marchbanks and Purdy, two previous ODOT employees, but they have not been served or otherwise appeared in this Court. (*See* Doc. 10).

38

circumstances, a private entity's "actions so approximate state action" that it may be held liable under § 1983. *Snodgrass-King*, 780 F. App'x at 204. Regardless of the approach the plaintiff uses, though, it is well settled that the plaintiff has the burden to prove that the defendants are state actors. *Inner City Cont., LLC v. Charter Twp. of Northville, Mich.*, 87 F.4th 743, 757 (6th Cir. 2023). So at the pleading stage, the question is whether the plaintiff has alleged facts from which the Court can reasonably infer that the plaintiff ultimately will be able to make that showing.

None of the three tests for transforming a private actor into a state actor helps Davis. Start with the exclusive-governmental-function test. Davis argues that because "Walsh administered civil-rights compliance obligations … on a DOT-funded project," it can be considered as exercising a public function. (Doc. 27, #624–25). But obtaining a government contract and ensuring that it and its subcontractors are compliant with federal law are not traditional public functions. *See Inner City Cont.*, 87 F.4th at 757; *Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 814–15 (2019) ("Numerous private entities in America obtain government licenses, government contracts, or government-granted monopolies. If those facts sufficed to transform a private entity into a state actor, a large swath of private entities in America would suddenly be transformed into state actors."). Walsh Kokosing was not the last word on compliance either; Davis acknowledges that Walsh Kokosing's decisions were still "subject to ODOT approval." (Doc. 27, #623). In that sense, then, Walsh Kokosing did not take over the responsibility of administering the DBE

39

requirements. So its actions did not involve a traditionally exclusive governmental function.

Second, Davis hasn't shown that there is a "sufficiently close nexus between the government" and Walsh Kokosing (or Quam). *Kister v. Henry*, No. 2:12-cv-119, 2014 WL 12770095, at *8 (S.D. Ohio Mar. 13, 2014). Overall, Davis argues that Walsh Kokosing administered a public program, the Bridge Project, in collaboration with ODOT. (Doc. 27, #623–24). But these allegations boil down to Walsh Kokosing overseeing its subcontractors', and its own, compliance with DBE requirements and compensation. (*See id.*). In *Lansing v. Michigan*, the Sixth Circuit affirmed that these dynamics do not transform a private entity into a state actor. 202 F.3d 821, 830 (6th Cir. 2000). "[I]t is now well-established that state regulation, even when extensive, is not sufficient to justify a finding of a close nexus between the state and the regulated entity." *Id.* (collecting cases). Likewise, "[e]qually well-established is the principle that neither public funding nor private use of public property is enough to establish a close nexus between state and private actors." *Id.* (collecting cases). Moreover, the fact that Walsh Kokosing was subject to state oversight and approval shows a degree of independence between the two. *Id.* at 832. In summary, acts by "private corporations whose business depends primarily on contracts to build roads, bridges, dams, ships, or submarines for the government … do not become acts of the government by reason of their significant or even total engagement in performing public contracts." *Rendell-Baker v. Kohn*, 457 U.S. 830, 841 (1982). With that, Walsh Kokosing is not a state actor under the nexus test either.

That leaves compulsion. Besides DBE compliance requirements, which are not sufficient to establish state action, Davis does not offer any facts suggesting that Ohio (or Kentucky) compelled Walsh Kokosing to be the prime contractor on the Bridge Project and to take allegedly discriminatory action against Davis. If anything, Davis attempts to allege that ODOT knew of and failed to take action regarding the Walsh Defendants' allegedly discriminatory acts, which is practically the opposite of compelling those acts.

In sum, Davis failed to meet his burden to show that the Walsh Defendants are state actors such that they can be held liable under 42 U.S.C. § 1983. Thus, the Court dismisses this claim against them as well.

### 4. Count 10 – Conspiracy to Interfere with Civil Rights under 42 U.S.C. § 1985.

Finally, Davis asserts a claim of conspiracy to interfere with civil rights under 42 U.S.C. § 1985(3) against both the Walsh Defendants and Green. (Doc. 1-25, #365–66). That section prohibits a conspiracy "for the purpose of depriving either directly or indirectly, any person or class of persons of the equal protection of the laws or of equal privileges and immunities under the laws." 42 U.S.C. § 1985(3). In order to establish such a conspiracy, "one must prove (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges or immunities of the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property of any right or privilege of a citizen of the United States." *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 314 (6th Cir. 2005) (quotation omitted). But § 1985(3)

41

"does not grant or create a substantive right." *Bowden v. City of Franklin, Ky.*, 13 F. App'x 266, 272 (6th Cir. 2001) (citing *Great Am. Fed. Sav. & Loan Ass'n v. Novotny*, 442 U.S. 366, 376 (1979)). It only provides a cause of action. *Id.*

Davis alleges that the conspiracy led to the deprivation of his rights under § 1981 and Title VI. (Doc. 1-25, #366). The Court, however, has already determined Davis has failed to adequately plead those claims. *See* supra Parts D.1 and D.2. So those claims cannot constitute the underlying deprivation. Thus, the Court must also dismiss this claim. *See Smith v. City of Toledo*, 13 F.4th 508, 520 (6th Cir. 2021) (citing *Beztak Land Co. v. City of Detroit*, 298 F.3d 559, 569 (6th Cir. 2002)) (dismissing § 1985(3) claim because underlying racial discrimination failed).

### 5. Remaining State-Law Claims.

Davis also raises several state-law claims against the Walsh Defendants: (1) tortious interference with a prospective business advantage; (2) intentional misrepresentation; (3) unjust enrichment; (4) fraudulent concealment; (5) negligence; and (6) civil conspiracy. (Doc. 1-25, #357–61, 367). Because the Court dismisses the federal claims, however, it declines to exercise supplemental jurisdiction over the remaining state-law claims.

A federal court may exercise supplemental jurisdiction over state-law claims that constitute the same case or controversy as a claim over which the court has original jurisdiction. 28 U.S.C. § 1367(a). But a court may decline supplemental jurisdiction where "the district court has dismissed all claims over which it has original jurisdiction." *Id.* § 1367(c)(3). A district court's decision whether to exercise

supplemental jurisdiction over state-law claims in the absence of any remaining federal-law claims is "purely discretionary." *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) (citing 28 U.S.C. § 1367(c)). "In determining whether to retain jurisdiction over state-law claims, a district court should consider and weigh several factors, including the 'values of judicial economy, convenience, fairness, and comity.'" *Gamel v. City of Cincinnati*, 625 F.3d 949, 951 (6th Cir. 2010) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)). "When all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims." *Id.* at 952 (quoting *Musson Theatrical, Inc. v. Fed. Exp. Corp.*, 89 F.3d 1244, 1254–55 (6th Cir. 1996)).

Here, the Court dismisses all federal claims, and the values of judicial economy, convenience, and fairness do not outweigh the interest in allowing state courts to decide the remaining questions of state law. Indeed, considerations of federalism and comity counsel strongly in favor of dismissing the state-law claims. As the Supreme Court has explained, "[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966). Moreover, this case is still in its infancy. This opinion addresses a motion to dismiss, and there have been no other substantive motions in this case. Judicial economy, then, strongly favors declining to exercise supplemental jurisdiction.

There is one wrinkle, though. The court dismisses the federal claims without prejudice. If Davis successfully amends his Complaint, or if JDLF appears with proper counsel, then the federal claim could proceed and in turn resurrect supplemental jurisdiction for the state-law claims. So rather than dispose of the state-law claims on jurisdictional grounds now, the Court holds them in abeyance. Should Davis (or JDLF) fail to move for leave to amend in the time the Court provides, the Court will dismiss the state-law claims without prejudice.[14]

## CONCLUSION

For the reasons discussed above, the Court **GRANTS** the Defendants' Motions to Dismiss (Docs. 20, 21, 23). Thus, the Court **DISMISSES WITHOUT PREJUDICE** Counts 5, 6, 7, 8, 10, and 12. Because Davis potentially could cure those deficiencies, though, the Court **GRANTS** Davis 30 days to file a motion for leave to amend, attaching a proposed amended complaint that addresses the above-identified deficiencies. The Court, however, **DISMISSES WITH PREJUDICE** Counts 1 through 5 against Williams, Counts 5 and 12 against Green in her official capacity, Counts 9 and 12 against ODOT, and Walsh Kokosing Joint Venture [I] as a

---

[14] In his Complaint, Davis invoked the Court's federal-question jurisdiction, 28 U.S.C. § 1331, and its supplemental jurisdiction, 28 U.S.C. § 1367. (Doc. 1-25, #339). The Court, however, notes that it may have subject-matter jurisdiction based on diversity under 28 U.S.C. § 1332, in which case it could not decline jurisdiction over the state-law claims. Davis and JDLF appear to be residents (and thus likely citizens) of Kentucky while Walsh Kokosing and at least ODOT are Ohio citizens. (*Id.* at #339–40). But, while that all *may* be true, Davis did not plead an amount in controversy or his or the other parties' citizenship, as required to establish diversity jurisdiction. *See* 28 U.S.C. § 1332. So at this point, the Court relies on the federal-question jurisdiction that Davis invoked as the basis for its jurisdiction here, and thus declines to exercise supplemental jurisdiction over the state-law claims.

Defendant. For now, the Court holds the state claims (Counts 1–5 and 11) against Walsh Kokosing in abeyance.

Additionally, the Court **ORDERS** Plaintiffs to show cause in writing within 30 days (1) why JDLF should not be dismissed for failure to prosecute due to the failure to secure counsel, and (2) why Defendants Marchbanks and Purdy should not be dismissed for failure to prosecute following the failure to timely serve them.

**SO ORDERED.**

March 30, 2026
 **DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**

45